W. E. Bundy, for the Village.

---

(Lucas County Court of Common Pleas.)

## WILLIAM MATTISON v. THE LAKE SHORE AND MICHIGAN SOUTHERN RY. CO.

*Blacklisting—Right of discharged employe.*

1. Where there is no contract for a given length of time, the employer has a right to discharge his employe at will, but he has no right to interfere with his employment elsewhere.

2. A petition alleging that the plaintiff had been employed by a railroad company, and that, having been discharged, his former employer, wrongfully and maliciously, combined with other railroad companies to prevent, and did thereby prevent, his obtaining employment by other railroad companies, by reason of which he sustained damages by loss of earnings, states a good cause of action.

(Decided September 25, 1895.)

---

PRATT, J.

This case stands upon a general demurrer to the petition. The matter was argued near the close of last term, but was not decided at that time, on account of the pressure of other matters, and the importance of the questions involved.

The petition was filed May 19, 1894, and soon after, a general demurrer was filed, and the question presented to me is simply whether the petition states facts sufficient to constitute a cause of action. The question has been very fully argued and authorities presented. It is an important question, and one upon which there is perhaps no direct decision—at least my attention has not been called to any directly in point—neither have I seen any. Since the adjournment of court I have examined quite fully the authorities cited, and such others as I could lay my hands on, and will now simply announce the conclusions to which I have come upon the matters submitted.

The petition sets up substantially these facts: That the plaintiff was formerly an employe of the defendant Railway Company; that the commenced working for this company in the year 1879, when he was seventeen years old; that he worked for them from that time until the year 1891—first as a brakeman and afterwards as a conductor, having been promoted about the latter part of the year 1885. He then alleges—to quote from the petition—"during all said time, from 1879 until said 9th day of March, 1891, he tried to and did become proficient in his knowledge of the duties required of him, and he performed all said duties faithfully and well. Plaintiff further says that he had never performed any work other than railroading and knew nothing of any other kind of work." He proceeds, after having made this allegation, to set forth in his petition copies of two certain rules, which he designates as "Black-List Rules," and charges that these rules had been adopted by the defendant company, and he also charges that these rules had been "adopted by all other trunk-line railroads in the United States." He then proceeds to set forth the appointment and action of the plaintiff as a representative of other workmen in making objection to these so-called black-list rules, and then avers:

"That shortly after the aforesaid meeting at which plaintiff so objected to said black-list rules, the defendant, by is officers and managers, conspiring and intending to injure plaintiff, and with malice, unlawfully, wrongfully and maliciously, did discharge plaintiff from its service and employment without cause or provocation."

It is nowhere alleged in the petition—and it is not claimed on argument—that there were any contract relations between the plaintiff and the defendant company whereby the defendant was required to retain the plaintiff in its employ, or whereby he was authorized to demand employment, or the company to demand that he remain in their employ—in other words, there are no contract relations set out defining the term of the employment. The petition then proceeds to allege: "That thereupon the defendant, conspiring, confederating and conniving together with a great many other railroad companies, all acting in concert, to defraud and injure plaintiff and deprive him of the income and benefit of his knowledge and skill as a railroad man and to further injure plaintiff and prevent him from securing employment in his chosen avocation, trade and calling, wrongfully, maliciously and unlawfully caused the said black-list rules to be enforced as against this plaintiff, thus preventing him from obtaining employment." He then proceeds to set forth certain efforts which he had made to secure employment with other railroad companies, and the refusal of other companies to grant him employment, and then alleges:

"That by reason of the premises and the wrongful, malicious and unlawful acts of the defendant company, plaintiff was and is prevented from securing employment in his chosen avocation in which he had so as aforesaid become proficient and skillful and in the pursuit of which he was able to and did make and earn good wages, tow-it, $120 per month, and he charges and alleges the fact to be that the defendant company wrongfully, unlawfully and maliciously enforced said 'black-list' rules numbered 625 and 626 against said plaintiff and demand and procured the enforcement of said rules against him by other railroads to his great damage."

He then proceeds to allege that he had been compelled to seek work elsewhere; had obtained employment as a policeman, but as such had been only able to earn $720 a year instead of $1,440 per year, which he had been receiving and obtaining as a railroad man.

In the argument upon the demurrer to this petition, it is alleged by counsel for the railroad company, defendant, that the damage, if any, sustained by the plaintiff by reason of his discharge was not a legal damage,

but one that comes within the phrase damnum absque injuria. That the company had violated no contract in the discharge of the plaintiff; that the defendant had a right to make these rules; that the plaintiff had a right to leave the employment of the defendant if he did not like it; that the rules were reasonable; that the purpose of the company in making the rules was not important, and that the defendant had no control over other companies. Those are, in brief, substantially the points urged by defendants counsel upon the court in argument, as I understand them.

On behalf of the plaintiff, it is claimed that this action is not based on a contract, or brought for any breach of a contract, but, it is claimed, that as employes may not combine so as to all quit the employment of a company at one time, and thus make it impossible for it to carry on its business, so, on the same principle, all the railroad companies cannot lawfully so combine as to make it impossible for an employe to obtain other work from other companies.

Both counsel have referred to the case of Dannerberg against Ashley, now pending in this court, which was heard before Judge Pugsley, upon certain motions which were made in the case, and in which he delivered an opinion upon the question as to the right of the plaintiff in that case to recover. Judge Pugsley's decision was taken to the circuit court, was there reversed and the cause remanded for trial by this court, but has not yet been tried. The stenographer's report of Judge Pugsley's opinion, and also a like report of the opinion of the circuit court, as delivered by Judge Haynes, have been furnished to me and carefully considered. I have also examined substantially all of the authorities cited in those opinions. If this case were the same as the Ashley case, there would be nothing left for me but to follow the decision of the circuit court; but, while they are the same in some respects, they are not in all respects the same, and it has therefore beeen necessary for me to examine and consider these opinions so far as they seem to throw light upon the subject—and they are, of course, both very able opinions—and I have also examined such other cases as I have been able to find.

It was alleged in the Ashley case that Ashley had actively and maliciously interfered between the employe and employer, and had procured the discharge of the employe. In this case there is no charge that the defendant procured the discharge of the plaintiff from another empoyer, but the charge is that it discharged him, and then prevented him from obaining employment by other railroads. The decision of the circuit court, in so far as it holds that an action may be sustained where there were no contract relations between the parties, providing for the employment for a certain length of time, is in favor of the plaintiff's contention here, and some at least of the cases referred to by Judge Haynes may be properly cited as sustaining the principle upon which this action is predicated. In this connection I refer especially to the Florida case, in 23 Florida Reports, 206; and the Maryland case, cited at the time as reported in 26 Atlantic Reporter, 505, but since then reported in 77 Maryland, page 396,* and following. This latter case I have especially examined, and it contains a very full discussion of the principles involved. There is, however, a full statement of the case in the opinion of Judge Haynes, and, for the benefit of counsel, will say that Judge Haynes states the case very correctly. I will only refer to a sentence or two of it, as found in the opinion of Judge Haynes, as applying especially to this case:

"In that case Lucke, who was a master cutter, had entered into the employment of a firm doing business—Rosefeld Bros.—doing business and trading as the New York Clothing House. He was entered at a salary of

---

* Reported also in the Bulletin at the time— see 30 W. L. Bull. 178.

$30 a week, under an agreement that they would take him upon trial, and afterwards, if his work was satisfactory, they would give him permanent employment, but with the right of the employing company to discharge him at the end of any week. After he had been a work some little time, the Clothing Cutters' and Trimmers' Assembly notified the clothing house to discharge, because he was not a member of a certain union."

Judge Haynes makes quite a long quotation from the opinion of the court in that case; but I will only quote from the last clause of this quotation made by him, as being specially applicable here: "Where a violent or malicious act is done to a man's occupation, profession, or way of getting a livelihood, there an action lies in all cases." This statement, of course, if taken by itself and taken for all it is worth, would be decisive in this case. But this is not the case that was involved before the court at that time, because the injury there was an injury that was done to the business of the employer and not an injury done to the occupation of the employe, therefore it is not to be taken as conclusive—but only as a statement of a principle, which, if a correct principle, would apply here, and, we might say, would decide this demurrer.

The question, then, is, whether this is the correct principle to apply to this case. No motion is made in this case asking for any correction in any way of the petition, no motion to make more definite and certain, and no motion to strike out; although there are some matters which it is claimed are not material, and which perhaps are not—which I have not referred to. But the petition uses the term "Black-Lists," without any very clear designation of what is meant by "Black-Lists," except as it may be drawn from the general allegations of the petition; and this term "Black-List," is substantially a new term. It is not found in Webster's Dictionary, in the edition which I have—which is a somewhat old one— and it is not found in the American Encyclopedia, in the edition which I have; it is found in a new work which has been cited to me—published in 1893—"Cogley on Strikes and Lockouts," on page 293, under the head of "Blacklisting," and I will read what is said there on the subject:

"Blacklisting is a part of the paraphernalia of a strike. It may be said to represent the malignant hate and revenge of the parties resorting to it. In its purposes and effects it is closely allied to a boycott. In fact it is sometimes resorted to in aid of a boycott. A blacklist is defined to be 'a list of persons marked out for special avoidance, antagonism or enmity on the part of those who prepare the list or those among whom it is intended to circulate; as where a trades union blacklists workmen who refuse to conform to its rules, etc. It is sometimes used by strikers against citizens to deter them from continuing dealing with the party or parties struck against,"—I come now to the clause that I think hits this case pretty nearly—"but it is most usually resorted to by combined employers, who exchange lists of their employes who go on strikes with the agreement that none of them will employ the workmen whose names are on the lists."

Construing therefore the petition under the broad rules under which we are to construe it, construing this black list to be what it is here defined to be, it comes, as it seems to me, within what is termed a conspiracy as laid down in this same book, on page 65:

"A conspiracy to compel an employer to have only a certain description of persons is indictable. It is a subversion of the liberty of the citizen. It has a direct tendency to restrain trade, and create a monopoly. A conspiracy to prevent a man from freely exercising his trade or profession, in a particular place, is indictable."

That, of course, refers directly to what is charged here.

"In many cases of conspiracy, the means employed have the sem-

blance of being lawful. They are frequently such as would be lawful in an individual. For instance, you have a right to have your boots, coat, or your hat made by whom you please. You may decline employing any particular shoemaker, tailor or hatter, at your pleasure. You may advise your neighbors not to employ a particular mechanic. But should you combine and confederate with others, to ruin any particular shoemaker, tailor, or hatter, or other mechanic or tradesman, by preventing persons from employing him, this would be unlawful and indictable.''

This, however, is a recent work and one that I never heard of until this matter came up for hearing, and other better known authorities have been cited before me which I have examined both as to the citations made and other portions of the bcoks.

Webb's Pollock on Torts has been cited, and I have examined it. On page 406 of the new edition, we have this heading: ''Malicious Interference with One's Occupation.'' It there says:

''There may be other malicious injuries not capable of more specific definition 'where a violent or malicious act is done to a man's occupation, profession, or way of getting a livelihood.'''

And in a note to that, under the same head note:

''To maliciously interfere with the business of a person engaged in a lawful occupation, with injurious results, constitutes a ground of action of trespass on the case. Such interference may be by a single individual or by a number of individuals conspiring together, and in the latter case the existence of the conspiracy should be considered as aggravating the wrcng and enhancing the damages. To maintain a suit for the malicious interference with one's occupation, it is necessary to prove: (1) Intentional and wilful acts; (2) calculated to cause damage to the plaintiffs in their lawful business, (3) done with the unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of the defendant (which constitutes malice), and (4) actual damages and loss resulting.''

A large number of cases are cited in this note. These, of course, are the words of the author, and the note is, I suppose, by Mr. Webb, but he cites a large number of cases, and among them are Walker v. Cronin, 107 Mass. 562. The citations are very long, and I will not stop to read them, except, perhaps, on a single point or two. In reference to this 107 Massachusetts, is this:

''One of the aims of the common law has always been to protect every person against the wrongful acts of every other person, whether committed alone or in combination with others; and it has provided an action for injuries done by disturbing a person in the enjoyment of any right or privilege which he has.''

I have examined these cases which are refered to, all of them. One is the case of Carew v. Rutherford, 106 Mass., and I believe that the statements made by the author in regard to it are perfectly correct; but I will not stop to further quote from the cases or from the author.

Cooley on Torts, of course, is a book of well recognized and high authority. On page 297 of the original, and 328 of the second edition, is this, under the heading: ''`Right to form Business Relations:''

''It is a part of every man's civil rights that he be left to refuse business relations with any one with whom he can make contracts, and if he is wrongfully deprived of this right by others, he is entitled to redress.''

And this clause, I take it, has special reference to this case:

''Thus, if one be prevented by the wrongful act of a third party from securing some employment, he has sought, he suffers a legal wrong, provided he can show that the failure to employ him was the direct and natural consequence of the wrongful act.''

And I may say, here, that authorities are in direct conflict in their decisions upon this question, but they turn upon the question of the legal right, and this author says that wherever they are prevented from securing some employment they suffer a legal wrong if it can be shown that the failure to obtain employment "was the direct and natural consequence of the wrongful act."

Now, not to quote too much of this—on the next page, under the heading: "Conspiracy to Prevent Employment," we have this:

"By conspiracy is here intended, a combination of two or more persons to accomplish, by some concerted action, an unlawful end of the injury of another."

I suppose that was intended to read "to the injury of another." And, on page 330 of this same—second—edition, it is said:

"The quality of the act, and the nature of the injury inflicted by it, must determine the question whether the action will lie."

The author discusses the subject principally in reference to the business of employers, when this has been injured by strikers, that being the form in which the question has most generally come before the courts, but he closes here—in the language of Judge Cooley, take it:

"The same doctrine would undoubtedly be applied to the case of employers, who, by combination and unlawful means, should prevent or seek to prevent the employment of any special class of laborers. Every man has the liberty of employing and being employed, and every man must respect the like liberty in others."

There is quite a late case in 147 Massachusetts, at page 212—not a long case—but it is one, like the most of the cases that can be found, where the employer is the party who is injured by the action or combination of employes. This was a case where a shoemanufacturer at Lynn was called upon by a committee from the Lasters' Protective Union in reference to the prices that were paid to lasters, they apparently not being satisfactory; and it is said that this association caused to be carried in front of Sherry's factory, by a boy hired for that purpose, a banner bearing the following inscription: 'Lasters are requested to keep away from P. P. Sherry's. Per order L. P. U.' Now, it may be said that many of the cases in which these questions have arisen generally turn upon questions of contract, and they have turned upon the question as to whether the matter published or stated was libelous. There are many cases where, if the matter was libelous the action has been sustained, and where, if it was not libelous, the action has been denied. In this case the court found that there was nothing that was libelous in the publication that was thus made by the poster paraded in front of the plaintiff's place of business. The plaintiff brings his action there against the members of the union, alleging damages to their business, and the opinion is delivered by Allen, J., in which he refers to the Cronin case in 107 Mass.—which seems to have been treated as a leading case all the time. It was not an action for damages, but an action for an injunction—going still further than an action for damages—and the court say—after citing the Cronin case, on page 214:

"The act of displaying banners with devices, as a means of threats and intimidation to prevent persons from entering into or continuing in the employment of plaintiffs, was injurious to the plaintiffs and illegal at common law and by statute.

Of course, what their statute is, I have not undertaken to inquire, but he cites the case of Walker v. Cronin, 107 Mass., and proceeds to say:

"We think that the plaintiffs are not restricted to their remedy by an action at law, but are entitled to relief by injunction. The acts and the injury were continuous. The banners were used more than three months

before· the filing of the plaintiff's bill, and continued to be used at the time of the hearing.   The injury was to the plaintiff's business, and adequate remedy could not be given by damages in a suit at law."

The court goes on to show that it could not be sustained upon the ground that it was libelous.   It was not claimed that there was any contract which had been violated, but it was aimed both at the continuance o f the employment and the procurement of others to enter their employment.   The court says:

"The scheme in pursuance of which the banners were displayed and maintained was to injure the plaintiff's business, not by defaming it to the public, but by intimidating workmen, so as to deter them from keeping or making engagements with the plaintiffs.   The banner was a standing menace to all who were or wished to be in the employment of the plaintiffs, to deter them from entering the plaintiffs' premises.

Now, as I have perhaps said before, the question here is, whether the doctrines thus announced in favor of the employer are the principles which should be applied in the case of the employe.   It is said, in Pollock on Torts, speaking of the right to employment by an employe, that it is the most serious right, affecting the laboring man's life.   Now, it seems to me —with all due deference, of course, to the opinions of the courts which are adverse — that the employe's right to employment is equally sacred with the right of the employer to employ him; it is not only a serious right, affecting a man's life, but you may say that it is his life.   The laboring man's employment is the only thing that stands between him and starvation, or what is very little less than starvation—pauperism, and it is for the public interest and for the public good that the right of a man to seek his own employment in any honest work which he may seek, should not be interfered with or violated.

This, of course, does not interfere at all with the right of a company, or of a man, to judge himself who he will have to work for him; and it makes no difference whether he refuses to let a man work for him because he is' incompetent or because he dislikes him; he has a right to°seek his employes, but, as is frequently said, one man's right ends where another man's commences, and the right of the employer to discharge ends with his own employment, and he must not trench upon the right of the employe to seek other employment by which he may support himself and his family, and it is for the public interest that the largest liberty to seek employment should be before every man whatever may be his employment, or whatever may be his business, trade or occupation.   It is also a matter of public interest to encourage men in becoming proficient in their employment.   It is, of course, a matter of public policy that a railroad company should have the right to employ such men as it sees fit and to judge itself of the competency of its employes—there is no doubt about that. It is, however, for the public interest that a man who is skilful and who has become proficient in his employment should be able to find employment, if not with one railroad, then with another railroad, or some other railroad; at least that the field should be open to him—that he should have that right, and while a railroad company may discharge its men and not employ them themselves, they trench upon the rights of the employes whenever they, by one deed or another, seek to prevent their employes from getting employment of other railroad companies, or combine or conspire in any way to prevent it, as is charged in this petition, and the matters alleged in the petition are, on demurrer, to be taken as confessed.

Of course there may be an injury that is not a legal injury resulting from a company discharging one of its employes, and so long as they simply discharge him their right to make the discharge should not be ques-

tioned; but if they make a combination, as is charged in this petition, with other companies, that they shall not employ him, then, it. seems to me they go beyond their legal right.

Now, in all this, of course, nothing is said or intended to be said as to what the line of proof may be, or what may be admissible or sufficient in order that he may make out the case charged in the petition; nothing is intended to be said here which shall bind this court, or any other court before whom it may be tried as to questions that may arise upon the trial of the case; but what I do hold is simply this: that upon this petition, considering it as it stands under the rules applicable to the construction of pleadings under our code, that the matters alleged here are sufficient to constitute a cause of action against the defendant, and the demurrer will therefore be overruled.

Col. M. B. Lemmon, for plaintiff.

E. D. Potter, Jr., for defendant.